UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE MCCARTHY, individually and on behalf of all other similarly situated individuals, | Case No. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| FIDELITY SECURITY LIFE INSURANCE COMPANY, INDEPENDENCE HOLDING COMPANY and INSURERS ADMINISTRATIVE CORPORATION, | Demand For Jury Trial |
| Defendants. | |

For her complaint, Plaintiff JANE MCCARTHY (the "Plaintiff"), on behalf of herself and all others similarly situated, and to the best of her knowledge, information and belief, formed upon a reasonable inquiry under the circumstances, now brings this action against Defendants FIDELITY SECURITY LIFE INSURANCE COMPANY, INDEPENDENCE HOLDING COMPANY and INSURERS ADMINISTRATIVE CORPORATION (collectively "Defendants"), and alleges as follows:

## I.    SUMMARY OF PLAINTIFF'S ALLEGATIONS

1.    This is a class action seeking redress for Fidelity Security Life Insurance Company's ("FSL's") unlawful practice, assisted by Independence Holding Company ("IHC") and Insurers Administrative Corporation ("IAC"), of systematically paying less than it was contractually obligated to pay for "out-of-network" ("ONET") health care services.

### A.    Overview of Defendants

2.    Independence Holding Company ("IHC") is a publicly held holding company principally engaged in healthcare insurance and related businesses.  IHC wholly owns, directly

and indirectly, various health insurance companies licensed to sell insurance products in 50 states and the District of Columbia, and health insurance administrative companies, including Insurers Administrative Corporation ("IAC").  IHC is a leading writer nationally of excess or stop-loss health benefits insurance for self-insured employers.

3.      IAC is a marketing and insurance administration corporation wholly owned by IHC through a chain of wholly owned IHC subsidiaries.  IAC manages approximately $230 million annually in individual and group health and life insurance premiums and premium equivalents, for multiple issuing carriers.  On January 24, 2006, IAC administered individual and group health and life insurance premiums and premium-equivalents relating to approximately 125,000 covered lives.

4.      Fidelity Security Life Insurance Company ("FSL") is an insurance company licensed to sell and selling health insurance products in 50 states and the District of Columbia. FSL is domiciled in the State of Missouri, with headquarters in Kansas City, Missouri.  As of December 25, 2005, FSL had agreements with 66 general insurance agents, 11 managing general agents, 52 third party administrators, and 3 agencies which were both a general agent and a third party administrator.[1]  Also as of that date, FSL's specialty benefits unit included prescription drug, vision and dental benefits under which there were approximately 2,000 insured groups, representing approximately two million participants.[2]  FSL uses IAC as a third party administrator, to determine payment amounts on claims under FSL health insurance policies, including Plaintiff's plan and Plaintiff's ONET claims.

---

[1]      Report of the Association Financial Examination of Fidelity Security Life Insurance Company as of December 31, 2005, adopted by the Director of the Missouri Department of Insurance, Financial Institutions and Professional Registration on May 23, 2007.

[2]      Id.

**B.**     **Overview of Relevant Facts Concerning Defendants' Wrongdoing**

5.     The selection and purchase of health insurance is vitally important to consumers. According to a recent survey conducted by the Office of New York's Attorney General, obtaining affordable healthcare is consumers' number one concern.  *Health Care Report: The Consumer Reimbursement System is Code Blue*, State of New York, Office of the Attorney General, January 13, 2009.  This class action is about a secret and intentionally concealed agreement among Defendants and other health insurers to depress reimbursements for ONET healthcare services, thereby raising the cost of unreimbursed healthcare for both patients and ONET providers.

6.     Many health insurers, including FSL, offer health insurance coverage that differentiates between medical treatment by (a) in-network providers who have negotiated and contracted for discounted rates with the insurer, and (b) out-of-network providers who charge insured patients their usual, non-discounted rates.  Health insurance plans that permit insured individuals ("Members") to seek medical care from out-of-network providers are more expensive than plans which limit Members to care provided by in-network providers – *i.e.*, they require higher premium payments.

7.     For Members who have contracted to obtain ONET benefits, and agreed to pay higher premiums in exchange for that flexibility, health insurers, including FSL, promise reimbursement for ONET charges at a percentage of the lesser of either (a) the actual amount of their medical bill, or (b) the usual, customary and reasonable rate (also called the "necessary, reasonable and customary" rate or "UCR") charged by similar providers in the same or similar geographic area for substantially the same service.  However, as set forth in this Complaint,

during the Class Periods FSL actually reimbursed its Members for ONET claims at a much *lower* rate.

8.      Plaintiff's legal claims in this case are directed at a secret and illegal agreement by Defendants, UnitedHealth Group, Inc. ("UHG"), Ingenix, Inc. ("Ingenix"), and most of the country's large health insurers, to systemically under-reimburse consumers for ONET benefits. Defendants and other health insurance companies agreed to manipulate the rates used to reimburse Members for ONET benefits.  Pursuant to this unlawful agreement, Defendants and their co-conspirators knowingly created, manipulated and used flawed data to set artificially low reimbursement rates for ONET services.   They also violated the Employee Retirement Income Security Act of 1974, as amended, and its governing regulations and federal common law (collectively, "ERISA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO") in order to further and conceal this scheme.

9.      Defendants' wrongful conduct affects hundreds of thousands of consumers nationwide who have paid more for ONET services as a result of Defendants' illegal agreement. The instrument to accomplish this conspiracy is a medical data services platform known as the Ingenix Database, maintained by Ingenix, which is wholly owned and controlled by UHG, the second largest insurer in the United States.  During the Class Periods, Defendant IAC contracted with Ingenix to obtain ONET claims data and receive uniform ONET pricing schedules, which were then used to calculate reimbursements for ONET services at artificially low rates ("False UCRs").  The False UCRs are presented as true UCRs, but are in fact substantially lower than the actual UCRs.

10.     Ingenix serves as the conduit of the conspiracy and is a hidden profit engine of the health insurance business, both fully-insured and self-insured.  Ingenix contracts with most of the

country's large health insurers, including FSL and IHC, to collect their ONET claims data. After Ingenix collects the data, it aggregates, manipulates and "scrubs" it to create False UCR schedules, which it then licenses to most health insurers and claims administrators, including Defendants. By using the False UCR schedules, FSL, with the assistance of IAC and IHC, was able to under-reimburse Plaintiff for her ONET claims.

11.     IAC made Plaintiff's health benefit determinations based on the False UCR schedules provided by Ingenix, knowingly and intentionally under-reimbursing Plaintiff for her ONET health care.

12.     During the Class Periods, FSL and IAC hid this scheme or artifice to defraud, including the existence and purpose of the Ingenix Database, through a series of material omissions and misrepresentations. There is an inherent and irreconcilable conflict of interest in using a price-setting mechanism, the Ingenix Database, which is controlled and propagated by UHG, Defendants and other health insurers, to create uniform pricing schedules for those same insurers. These health insurers have a strong incentive to artificially deflate the amounts of money they must reimburse Members for ONET claims. It is not surprising their use of the Ingenix Database results in systematic ONET under-reimbursement.

13.     Until recent news reports detailed the New York Attorney General's investigation, the process of setting UCRs for ONET services was effectively hidden from consumers who purchase and/or participate in health insurance plans. This lack of transparency was facilitated by, *inter alia*, the following practices:

- In their healthcare plans that cover ONET services, Defendants and other insurers affirmatively represented that they will reimburse according to the UCR rate, which a reasonable consumer would understand to literally mean the "usual and customary rate" or "necessary, reasonable and customary rate" charged for such services;

- Defendants did not disclose their conflict of interest, *i.e.*, that the Ingenix Database, which is owned and controlled by health insurance companies in agreement with Defendants and other insurers, is used to determine False UCRs;

- Defendants concealed the fact that health insurers regularly and intentionally exclude important data points, to depress UCRs and under-reimburse for ONET services; and

- Defendants concealed that Ingenix "scrubs" the data it receives from Defendants and other insurers, to remove information that would result in higher reimbursement rates.

14.     Plaintiff alleges the existence of (a) direct agreements in the form of contracts between Ingenix and many healthcare insurers and third party administrators ("TPAs"), including Defendants, to obtain and/or provide ONET UCR pricing information; and (b) a lengthy chronology of facts that demonstrates a conspiracy between and among Defendants, UHG and Ingenix to develop False UCRs that are, in turn, used to determine Members' reimbursement for ONET healthcare.

15.     Plaintiff was insured by FSL during the Class Periods and sought ONET benefits for treatment of cancer.  As alleged herein, FSL, through its third party administrator IAC, engaged in a lengthy and adversarial battle with Plaintiff, denying payment for substantial portions of the charges that were assessed by her ONET providers, thereby shifting crushing medical costs to Plaintiff that should have been covered by FSL's healthcare insurance policy.

16.     FSL, as the company that issues and insures, and IAC, as the company that administers the employee welfare benefit plan through which Plaintiff received her healthcare, are both subject to ERISA.  FSL is a "fiduciary" toward Plaintiff under ERISA because Plaintiff's health plan is a fully-insured plan and its benefits are payable directly from cash held and owned by FSL.  IAC is a "fiduciary" toward Plaintiff under ERISA because of the activities

IAC performed when administering Plaintiff's plan and her benefits, including making specific coverage and benefit decisions and deciding her ensuing claims appeals.

17.     Plaintiff alleges that FSL's wrongful underpayments, and IAC's assistance therein, violated their legal obligations to Plaintiff and the Classes as plan participants under ERISA and citizens under RICO, as described below.

18.     Defendants' deceitful and pervasive business practices forced Plaintiff and the Classes to expend significant time and resources to identify, dispute and then appeal Defendants' improper reimbursement determinations, often still resulting in underpayment.  Defendants' conduct violated their legal obligations to Plaintiff and the Classes and violated federal and state law as described herein, causing Plaintiff and the Classes significant financial harm.

19.     Plaintiff seeks declaratory, injunctive, and restitutionary relief, damages and treble damages, and other remedies for Defendants' unlawful conduct.

## II.     JURISDICTION AND VENUE

20.     ERISA governs the rights and duties of FSL and insureds of employer-sponsored health care plans.  29 U.S.C. § 1132.  This Court has jurisdiction of those claims under 29 U.S.C. § 1132(e).  Subject matter jurisdiction also exists under both 28 U.S.C. § 1331 and §1332(d).

21.     Venue is appropriately established in this District under 29 U.S.C. § 1132(e)(2), 28 U.S.C. § 1391, and § 1965 of RICO because FSL, IHC and IAC each conducts a substantial amount of business in this District and insures and administers health plans both inside and outside of this District; because most of the acts complained of as to Plaintiff took place in this District; and, because Plaintiff resides in this District.

III.    **THE PARTIES**

    A.    **PLAINTIFF**

22.    Plaintiff Jane McCarthy resides in Lincoln, Nebraska and brings this action on behalf of herself and all others similarly situated.  As detailed below, Plaintiff has standing to pursue all her claims and jurisdiction and venue are appropriate.

    B.    **DEFENDANTS**

23.    Defendant Fidelity Security Life Insurance Company offers, underwrites, and insures commercial health benefits, including those of Plaintiff at issue.  FSL is organized and domiciled in Missouri with its principal place of business located at 3130 Broadway, Kansas City, Missouri 64111-2406.  FSL is licensed to do business and sell insurance in Nebraska, and does so.  The majority of all outstanding FSL corporate shares are owned by Richard F. Jones, an individual.

24.    Defendant Independence Holding Company owns, directly and indirectly, various insurance and administrative companies.  Defendant IAC is one of IHC's primary administrative companies.  Defendant IHC is a Delaware corporation with its principal place of business located at 96 Cummings Point Road, Stamford, Connecticut 06902-7912.  IHC, directly or indirectly, wholly owns subsidiaries licensed to sell and selling insurance in all 50 states and the District of Columbia.

25.    Defendant Insurers Administrative Corporation underwrites and administers individual and group health insurance.  IAC is an Arizona corporation located at 2101 W. Peoria Ave. # 100, Phoenix, Arizona 85029-4925, and does business in this District.   Defendant IAC is an indirect wholly-owned subsidiary of Defendant IHC.

C.       **NON-DEFENDANT CO-CONSPIRATORS**

26.       Other natural persons, corporations and entities participate as Co-Conspirators, including:

27.       UnitedHealth Group, Inc. offers, among other things, health insurance products and services and network-based health and well-being services to plan beneficiaries.   A Minnesota corporation, UHG's principal place of business is at 9900 Bren Road East, Minnetonka, Minnesota 55343.

28.       Ingenix, Inc. is a wholly owned subsidiary of UHG and offers a comprehensive line of clinical and cost management solutions for health care payers, providers, employers, pharmaceutical manufacturers, government agencies and others requiring health care information.  The company's products and services are represented by four business groups including:  (i) software and data services; (ii) publishing; (iii) pharmaceutical services; and (iv) consulting.  Ingenix licenses the use of its proprietary Ingenix Database to insurers and TPAs who use it to set reimbursement schedules for out-of-network, non-negotiated medical services. A Minnesota corporation, Ingenix's principal place of business is at 12125 Technology Drive, Eden Prairie, Minnesota 55344.

29.       Health Insurance Association of America ("HIAA"), now known as America's Health Insurance Plans ("AHIP"), is a trade group for the health insurance industry (AHIP may be referred to hereinafter as "HIAA/AHIP").  It is a national association comprised of a variety of medical entities, but notably major health insurance companies, including its Co-Conspirators. It claims to provide "a unified voice for the community of health insurance plans" by representing the interests of its members on legislative and regulatory issues at the federal and state levels, and by providing conferences and publications.

30.     In addition to UnitedHealth Group, Inc., Ingenix, Inc., and HIAA/AHIP, other health insurance companies not named as Defendants have participated in the alleged unlawful conspiratorial activity in violation of federal and state law.  Such violations include, *inter alia*, knowingly providing flawed and misleading claims data to Ingenix for use in determining False UCRs; knowingly acquiescing in flawed and improper manipulation of claims data provided by Ingenix; and knowingly using artificially low UCRs produced by Ingenix to determine reimbursements for ONET services.  UnitedHealth Group, Inc., Ingenix, Inc., HIAA/AHIP and the other non-Defendant health insurance companies are collectively referred to herein as the "Co-Conspirators."

31.     Whenever reference is made to an act, statement, or transaction of any corporation or entity in this Complaint, including each Defendant and Co-Conspirator, the allegation means that the corporation or entity acted, stated or transacted by or though its directors, members, partners, officers, employees or agents while they were engaged in the management, direction, control or conduct of that corporation's or entity's business and while acting within the scope of their authority.

32.     At all times mentioned in the allegations herein, each and every Defendant and Co-Conspirator was an agent or representative of and aided and abetted in the unlawful conduct of each other Defendant and Co-Conspirator.  In doing the things alleged herein, each and every Defendant and Co-Conspirator acted within the course of such agency or representation and with the consent, permission and authorization of the other Defendants and Co-Conspirators.  All actions of each Defendant and Co-Conspirator alleged herein were ratified and approved by the other Defendants and Co-Conspirators.

III.     FACTS

   A.      **FSL PLANS PROVIDE COVERAGE FOR OUT-OF-NETWORK SERVICES**

   33.     FSL issues documents to each of its plan participants and beneficiaries setting forth the benefits that FSL promises to pay on their behalf.

   34.     Like most health insurance plans, FSL's plans differentiate between: (a) coverage for medical treatment from "in-network" providers who have negotiated discounted rates with the insurer, and (b) coverage for treatment from "out-of-network" providers who charge insureds their usual, non-discounted rates.  Health insurance plans contracting with in-network providers preclude those in-network providers from billing insured patients in excess of the contracted-for in-network rates.  Conversely, out-of-network providers have no service contract with the insurance company.  They are not precluded from billing their usual rates.  In cases where the out-of-network provider bills in excess of what FSL determines to pay, the balance not paid by FSL becomes the responsibility of the FSL Member.

   35.     When FSL Members receive ONET services, FSL's payment is based on a percentage of the lesser of the billed charge, or what FSL describes in Plaintiff Jane McCarthy's plan documents as the "necessary, reasonable and customary" rate for the service received. Plaintiff's FSL health plan states "necessary, reasonable and customary":

>          Means the charge made for necessary medical services and supplies generally furnished for Sickness or Bodily Injuries of comparable severity and nature in the geographical area in which the services or supplies are furnished.
>
>          In assisting Us in reaching Our determination as to what amount should be considered as Necessary, Reasonable and Customary for services and supplies, We use and subscribe to a standard industry reference source which collects data and makes it available to its member companies.  The database used reflects the amounts charged by providers for health care services based on the smallest geographic zip code areas generating a statistically credible charge

distribution.  This data is updated and published twice annually. The data is reflective of reported provider charges from the lowest to the highest for each service or supply.  The data is also adjusted periodically to reflect negotiated fee schedules with providers not included in the database.  We then use a specific representative percentile of that range of charges to determine the Necessary, Reasonable and Customary charge for all insureds under this Coverage.

When it is determined by Us that a Covered Charge by a provider is above the Necessary, Reasonable and Customary amount, the charge may not be paid in full as a Covered Charge.

36.     The portions of ONET charges not paid by FSL are not credited to satisfy deductibles or out-of-pocket maximums, which otherwise limit the total amount a plan Member must pay for medical services during the policy period.  As detailed below, FSL utilizes the faulty Ingenix Database to set its ONET UCR amounts.

## B.      THE INGENIX DATABASE AND DEFENDANTS' DETERMINATION OF ONET UCR

### 1.      Development of the Ingenix Database

37.     Ingenix, a wholly owned subsidiary of UHG, is a self-styled nationwide "health care information company" that sells "customized fee analyzers" to healthcare insurers and automobile liability insurance companies.  Ingenix creates "modules" or uniform claims pricing schedules, which provide whole-dollar reimbursement amounts at each price percentile (for instance, the 80th percentile) for a given medical procedure, in localized geographic areas.  All users of the Ingenix Database, i.e., Defendants and their Co-Conspirators, are given the same dollar amounts by percentile for each particular procedure within a geographic area.

38.     In 1973, HIAA created a database called the Prevailing Health Charges System ("PHCS") as a way to aggregate and compile physician charge data as a service to its insurer members.  The PHCS was formed by obtaining historical charge data for surgical and anesthetic procedures from HIAA's members, including health insurance companies, TPAs, and self-

39.     Once created, PHCS became the largest pool of medical service charge data in the country, despite its many flaws.  It contained data from more than 150 health claim payer contributors from 50 states, the District of Columbia, Puerto Rico and the Virgin Islands.

40.     The information HIAA collected from its member insurers, however, only consisted of four data points:  (1) the date of service; (2) the CPT Code; (3) the billed charge; and (4), the location of service or "geo-zip" (defined below).  This was the only information HIAA obtained from its members to create the PHCS.

41.     Current Procedure Terminology ("CPT") codes are a system in which the American Medical Association and other interested parties, including insurers, categorize all medical services by five-digit numeric codes.  "Geo-zips" are portions of states comprised of cities and towns sharing the first three-digits of a postal zip code.  Ingenix grouped geo-zips and (depending on population density) combinations of geo-zips together because of geographic proximity and what it arbitrarily concluded were "data similarities."

42.     In fact, HIAA (via its committees and Board of Directors) consciously limited the amount of information it gathered from PHCS data contributors.  In its own documents, HIAA stated that the data was limited and the quality of the data was "questionable."

43.     Once HIAA obtained the "questionable" data, it compiled the submissions and created the PHCS, which it then licensed to its members.  However, HIAA expressly informed insurers that the PHCS was not intended to be used to establish UCR rates.

44.     The PHCS was thus built on claims data from health insurance companies, but was not designed to determine precise reimbursement amounts – only to provide a general idea about prevailing charges in a given area, based on the admittedly limited data HIAA collected.

45.     HIAA provided a disclaimer with the PHCS data:

> The DATA, whether actual charge data, derived charge data, conversion factor data or length of stay data, are provided to the LICENSEE for information purposes only.  The HIAA disclaims any endorsement, approval or recommendation of the DATA. There is neither a stated nor an implied "reasonable and customary" charge, either actual or derived; neither is there a stated nor an implied "reasonable and customary" conversion factor or length of stay.  Any interpretation and/or use of the DATA by the LICENSEE is solely and exclusively at the discretion of the LICENSEE.  THE LICENSEE MUST NOT represent the DATA in any way other than as expressed in this paragraph.

46.     "Derived charge data" are reported by the PHCS database for CPT codes for which fewer than nine charges were reported by data contributors during the submission period. The PHCS database derives charge data for approximately 90% of all CPT codes billed, because the vast majority of reported claims use the most common 10% of CPT codes.  Creation of derived data is discussed in detail beginning at ¶ 76 below.  The MDR database (see *infra*, ¶¶ 49-50) derives charge data for all CPT codes.

47.     PHCS was designed to provide limited information about provider charges, but not to determine precise reimbursement amounts.

48.     In October 1998, HIAA sold the PHCS to Ingenix.  PHCS is now part of the Ingenix Database.

49.     In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based provider of healthcare products that, among other things, sold a provider charge database known as "MDR".

50.     As Ingenix acquired MDR and PHCS, it kept the databases separate but merged the underlying raw data.  MDR and PHCS used different methodologies to produce output from the same data, for the two databases.  As a result, the dollar amounts can and do differ between the databases for individual CPT codes at the same percentile.  Defendants applied the MDR database from Ingenix to Plaintiff's ONET claims.

51.     The Ingenix Database is marketed by UHG as the "industry standard."  UHG, Defendants, and the Co-Conspirators all use the same Ingenix-established UCR rates to reimburse Members and providers for ONET services.

52.     To create the Ingenix Database, Ingenix enters into data contribution contracts and licenses with health insurers, including Defendants and Co-Conspirators, to (i) obtain data and information surrounding billing rates, from those health insurers; and/or (ii) provide UCR uniform pricing schedules to those same health insurers, including Defendants and Co-Conspirators, to pay their ONET claims.  Ingenix offers the Ingenix Database to health insurers at a discounted rate, or free if those insurers agree to provide their claims data to Ingenix to create that very database.

## 2.     FSL and IAC Use The Ingenix Database Despite Ingenix's Disclaimer

53.     IAC, as FSL's TPA, uses the information licensed from Ingenix to determine UCR rates for ONET claims, even though Ingenix broadcasts that it is not endorsing, approving or recommending use of its data to determine UCR rates.

54.     Ingenix updates its database semi-annually.  With each semi-annual database iteration, Ingenix includes the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to subscribers for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. There is neither a

stated nor an implied "reasonable and customary charge" (either actual or derived).

55.    Throughout the Class periods, Defendants have been aware of the disclaimer but did not disclose its existence or substance to Members seeking ONET reimbursement.  Instead, Defendants repeatedly "represented" the Ingenix data to be other than as described in the disclaimer.  Defendants use both actual and derived data as a "reasonable and customary charge", in direct contravention of the disclaimer and federal and state law.

56.    Despite its own disclaimer, Ingenix continues to license its database to Defendants and their Co-Conspirators for ONET reimbursements, which turn out to be artificially low.  Indeed, UHG and Ingenix promise that Ingenix Database users, including Defendants and their Co-Conspirators, will achieve substantial savings, including a 16:1 return on their Ingenix license investment.

**3.    Ingenix's Method of Collecting Data Is Not Scientifically Valid**

57.    To create and update its database, Ingenix relies entirely on data from claims information providers under its "data contribution program," in which health insurers who are Ingenix licensees submit information about the amounts they have been billed by an undisclosed number of unidentified health care providers, for specific CPT or "HCPCS" code services.  Healthcare Common Procedure Coding System ("HCPCS") codes are monitored by CMS, the Centers for Medicare and Medicaid Services, and are based on the CPT system.   They generally describe medical equipment and injectables.

58.    There are two preferred methods by which samples may be collected for statistical analyses:  (i) the sample may be a "scientific" sample, which is essentially a random sample of an entire population, within which each population element has a known, non-zero chance of being included; or (ii) the sample can be a "judgment" sample, in which the sample elements are

handpicked because they are expected to represent a relevant population and serve a specific research purpose.

59.     The sample collected by Ingenix consists of whatever information those insurers that happen to be data contributors happen to contribute and which happen to survive the Ingenix scrubbing process (see *infra*, ¶ 73).  This is not a scientific sample because it is not a random sample of any entire population (e.g., of all medical service charges).  It is not a judgment sample because the data was not deliberately selected to represent a relevant population and serve a specific research purpose.  Instead, the Ingenix Database is based on data collected from a sampling method known as "convenience" sampling.  A convenience sample is also known as an "accidental" sample, because the data are included in the sample as if by accident.  This sample would be statistically flawed even if Ingenix's data contributors turned over all of their charge data to Ingenix (which they do not, see *infra*, ¶¶ 65-66), because Ingenix data contributors are self-selected, without regard to the representativeness of their contributed charge data.  That is, the universe of claims, to which this data is ultimately applied, is considerably larger than the self-selected sample, and is not homogeneous.

60.     The major disadvantage of convenience sampling is that one cannot assure the representativeness of the information collected with respect to the population (e.g., of all medical service charges) as a whole.  In such a case, it is incumbent on the data collector to externally test and validate the sample to ensure the sample is representative of the population.  A large convenience sample size does not ensure accuracy or comprehensiveness.

61.     Ingenix and Defendants are aware of these flaws in the sampling procedures used to form the Ingenix Database.  However, neither Ingenix nor any of Defendants have ever tested or validated the data comprising the Ingenix Database, to determine whether such data is

### 4.      Ingenix Uses Few and Inadequate Data Points

62.     Following a Member's treatment by an ONET provider, that provider submits a standardized claim form to the entity administering claims; that claim administrator then extracts information from the claim form to submit to Ingenix.  However, the only information provided from the claim form to Ingenix is these four data points:  (1) the date of service; (2) the CPT code; (3) the geo-zip where the service was provided; and (4), the amount billed.

63.     During 2005, HIAA members discussed submitting more than these four data points to Ingenix, recognizing expressly that the four data points were limited and inadequate as a basis to calculate accurate UCR rates.  Additional potentially relevant data points included provider identification, licensure, specialty, patient age and gender, and type of facility in which the service was provided.

64.     Despite this express acknowledgement that the four data points were limited and inadequate, the HIAA members opted to continue to submit only the four above-listed elements to Ingenix.  Defendants never advised FSL's Members of the inaccuracy caused by using only four data points, or of the failed attempt to expand the number of data points collected.

65.     Health insurers continue to enter these four simple data points onto a standardized claims data submission form provided by Ingenix.  However, prior to submission, health insurers "scrub" their claims submissions forms to remove the highest charges, submitting only the lowest claim amounts for a given service.  This results in a lower average reported cost for each service (CPT Code) scrubbed.

66.     Defendants, UHG, and their Co-Conspirators affirmatively manipulated their data contributed to Ingenix, to incrementally push their collective ONET claim reimbursements lower.

67.     Once Ingenix receives the data contribution forms (containing only the four data points), it combines that information from all data contributors, to create the Ingenix Database.

68.     Because it only tracks four data points, Ingenix necessarily uses only those elements (date of service, CPT code, geo-zip, and amount billed) to create the Ingenix Database. This is a classic example of "garbage in, garbage out".  These four data points do not identify the provider or his/her credentials or level of experience, the patient (including age and condition), any adjustment for cost of living factors, the specific provider discipline performing the services (e.g., physician or non-M.D.), the provider's usual charge or licensure, the type of facility where the service was performed (e.g., hospital, clinic, doctor's office, nursing home or intensive care unit), or the prevailing fee or charge level for any provider or service in a particular geographic region.

### 5.     Ingenix Manipulates Modifiers

69.     Ingenix further decreases the amount of specificity provided on the data contribution forms by removing any CPT "modifiers" contained on those forms.  Modifiers consist of a two-digit suffix that providers append to a five-digit CPT code to signify an alteration or augmentation of the stated service, or otherwise identify the circumstances in which the service was provided.   Modifiers generally increase reimbursement rates.

### 6.     Ingenix's Flawed Use of Geozips

70.     The Ingenix Database does not always locate data to the specific geographic area where its resulting UCR would apply, contrary to the statement in FSL's plan document given to Plaintiff, which stated that "necessary, reasonable and customary" charges used for

reimbursement are those "in the geographical area in which the services or supplies are furnished."  Instead, Ingenix divides all states into geo-zips and (depending on population density) combinations of geo-zips, grouped together by geographical proximity and what Ingenix concludes to be "data similarities."  These derived geo-zips are not medical service areas amenable to accurate cost comparison.

71.     Distortions created by using "geo-zips" are recognized by Ingenix.  In one of its Customized Fee Analyzers provided to health insurers, Ingenix states that:

> Because the fee ranges in the Analyzer are based on the first three digits of your geo-zip, you need to assess where your locale stands in relation to others in this three-digit area.  For example, many different three digit areas contain both urban and rural locales with different charging patterns.  Use your judgment to determine how to interpret the fee range for your particular community.

72.     Defendants and their Co-Conspirators fail to exercise reasonable judgment when determining validity of the specific geo-zip applicable to a particular UCR determination, including whether it contains "urban and rural locales with different charging patterns."  Instead, FSL and IAC rely strictly on the geographic groupings utilized in the Ingenix Database, without taking into account different charging patterns within the geo-zip.

### 7.     Ingenix "Scrubs" the Contributed Data

73.     After Ingenix receives data contribution forms from individual insurers (which those insurers have already scrubbed), it then "scrubs" the pooled data to remove high-end values but not low-end values, so as to lower the average amount of ONET reimbursements.  Ingenix makes formulaic edits to identify purported statistical outliers, then automatically removes them without factual basis or investigation to determine whether they are truly incorrect (and should be removed) or are simply valid high charges.  Incorrect removal of valid high charges biases the entire data set downward.

74.     Using the results of these data collection procedures, Ingenix then produces two cycles of uniform ONET pricing schedules each year, which include medical, surgical, anesthetic, and coding system service rates for a given geographic area and CPT or HCPCS code.  When Defendants receive these uniform pricing schedules, they are uploaded onto their computerized claim administration platforms and systematically used to determine UCR rates for ONET claims.

75.     IAC computer systems automatically adjudicate claims, without human intervention, for FSL ONET reimbursements.  The Ingenix Database is automatically applied. No human intervention occurs to evaluate individual claims or the accuracy of any UCR amount provided by Ingenix.

### 8.     The Derived Data Is Flawed

76.     The "conversion factor data," which is used to develop the "derived" data referred to in the HIAA disclaimer (see *supra*, ¶ 46), are not the charge data contributed to Ingenix.

77.     Throughout the relevant time period, derived data has set UCR reimbursements for the majority of ONET medical and surgical services nationwide.  Derived data is not specific to a provider, patient or procedure (CPT code).  Rather than setting out rates for healthcare services based on what providers actually charge in the marketplace, derived data uses a "relative value" assigned to each discrete medical procedure that is multiplied by a "conversion factor". As a result, there is no relationship between the derived data and providers' actual charges in the marketplace.  Moreover, there is no scientific or other kind of support for Defendants' use of derived data from the Ingenix Database to set ONET UCR reimbursement.

78.     Derived charges do not reflect necessary, reasonable and customary charges made by actual providers; rather, they are artificial prices that Defendants use to understate true UCR.

79.     CPT Codes combined to derive data frequently describe diverse procedures, ranging from the most simple (and, generally, lowest cost), representing the largest cohort of charges, to the most complex (and, generally, of highest cost).  For derived charges to provide a valid determination of reasonable compensation levels, an adjustment must be made to account for respective distribution and spread of common and less common procedures.  This adjustment requires computation of standard deviations.  This computation is not performed by Ingenix or any Defendant.  Because Ingenix and Defendants fail to consider that some CPT codes have a wider distribution of charges (i.e., standard deviation among billed charges) than others, the derived charge percentiles understate the true upper percentile values for those CPT codes.  This is a particularly significant statistical flaw because those CPT codes with a large number of observations tend to represent relatively common procedures and are being grouped with CPT codes with fewer observations that tend to represent relatively less common procedures.  Thus, the derived data, which is improperly calculated, does not comply with Defendants' UCR definitions as presented to Class members.

80.     Ingenix cannot guarantee that all claims received for reimbursement of a particular CPT code during any given time period have been reported, much less accurately reported, by its data-contributing insurers.  Nor can Ingenix ascertain if the listed provider bills represent the unnamed providers' usual and customary charges for the service, or, instead, reflect a discounted rate required by PPO Service Agreements the provider may have entered with other insurers.  While Ingenix requires certification that billed CPT code data are accurate and complete, Ingenix is at the mercy of its self-interested data contributors, because there is no Ingenix mechanism to enforce or validate client claims data certificates.

81.     Ingenix has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median or 80th percentile of actual marketplace CPT code service rates charged by any provider.

82.     The end result of this cycle of self-interest and collusion is a database that produces uniform but flawed pricing schedules which Defendants and their Co-Conspirators use to systematically under-reimburse Members for ONET services.   The flaws in the Ingenix Database are pervasive, and include:

        a.      questionable accuracy of underlying contributed data;

        b.      failure to inquire whether all contributors use the same data production criteria and coding and aggregating methodology;

        c.      failure to inquire regarding each or any individual contributor's data production criteria and coding and aggregating methodology, and whether such individual contributor adheres to such criteria and methodology accurately or consistently;

        d.      when not enough charge data are present for a CPT code to provide a statistically valid sample, Ingenix aggregates data from similar codes to create a large enough "sample";

        e.      Ingenix considers geo-zips and combinations of geo-zips to constitute "sociodemographic regions", though there is no empirical verification that such regions constitute medical service areas amenable to cost comparison;

        f.      scrubbing of claims data by Ingenix, removing outliers in a subjective manner, i.e., removing high-end values but not low-end values;

g.      failure to apply any appropriate statistical methodology (including sampling, data editing and data estimation), resulting in data that are inappropriate and biased lower;

h.      scrubbing by contributors of the data that Ingenix receives, resulting in data that is flawed even before Ingenix further scrubs it;

i.      inclusion of charges for procedures in non-comparable geographic areas;

j.      failure to segregate performed procedures by provider discipline, education or skill, instead combining all gathered discrete CPT codes;

k.      combining ONET provider claims with "in-network" provider claims, thus skewing the ONET claims data downward;

l.      ignoring supply and demand, does not distinguish between the quantities of providers whose charges are reflected in various geo-zips; and

m.      failure to edit out claims data reflecting negotiated or contractually discounted charges.

83.     As the Staff Report to the Senate Committee on Commerce, Science, and Transportation, "Underpayments to Consumers by the Health Insurance Industry" (June 24, 2009) ("Senate Report"), concluded:

> Although the insurance industry represented the Ingenix data as accurate and objective, subsequent investigations have revealed that the reliability of the Ingenix data was fatally undermined by faulty statistical methods and a fundamental conflict of interest. . . . In testimony before the Senate Commerce Committee in March 2009, UnitedHealth Company's CEO publicly expressed his regret that there was a conflict of interest inherent in his company's relationship with Ingenix. . . .
>
> Evidence collected during private litigation and the New York Attorney General's investigation demonstrated how the less-than-arms-length relationship between Ingenix and the insurance industry led to reimbursement practices that cost American

consumers billions of dollars.  Insurers that contributed charge data to Ingenix often "scrubbed" their data to remove high charges. Ingenix then used its own statistical "scrubbing" methods to remove valid high charges from their calculations.

## C.   THE CONSPIRACY TO CREATE AND LOWER UCR RATES IN ORDER TO UNDER-REIMBURSE ONET HEALTHCARE CLAIMS

84.     In October 1998, the members of HIAA agreed to sell the PHCS to Ingenix for an undisclosed amount of money.  This was part of a plan by Ingenix to acquire a dominant share of the market for provision of ONET UCR claims data.  This plan led UnitedHealth Group and Ingenix to acquire more than 50 existing claims data and software companies.  In December 1997, prior to the PHCS acquisition, Ingenix had purchased the MDR derived-data database from Medicode, Inc.  Ingenix would later merge those two databases to form what is now known and referred to herein as the Ingenix Database.  Defendants apply the Ingenix Database to Plaintiff's and Class members' ONET claims, and thereby reduce their reimbursement obligations.

85.     Under the terms of the 1998 sale, HIAA and Ingenix agreed for HIAA member insurers to participate in an ongoing Ingenix PHCS Advisory Committee, which would provide input into what and how contributed claims data were used by Ingenix.  Additionally, all HIAA internal staff personnel then working on the PHCS were offered similar positions with Ingenix.

86.     IAC is a licensee of the Ingenix Database and applied the Ingenix Database on behalf of FSL to Plaintiff's and other class members' ONET claims consistently during the class periods.  Defendant Independence Holding Company, which through subsidiaries wholly owns and controls Defendant IAC, is a member of America's Health Insurance Plans (now AHIP, formerly HIAA).  AHIP's website links to Defendant IHC's website as part of "an informational service for consumers."  In its June 15, 2006, annual meeting of stockholders, IHC presented an

"Organization Chart" showing its direct command and control of IAC by IHC with no intervening subsidiaries.[3]

87.     Accompanying the sale to Ingenix, HIAA and Ingenix agreed to a 10-year Cooperation Agreement providing HIAA a continued role in development and operation of the PHCS and also a lasting co-mingling of Ingenix and HIAA in the form of a "Liaison Committee" to advise and evaluate Ingenix.

88.     The Cooperation Agreement further provided that Ingenix would charge HIAA members 50% less than non-HIAA members for use of the Ingenix Database, and that Ingenix would waive all license fees for HIAA members contributing data.

89.     Ingenix, upon purchasing the PHCS, also entered into a Confidentiality Agreement mandating that it shield from disclosure the identity of entities (many Co-Conspirators in this action) that had or would submit information for use in the database.

90.     At the time of the PHCS sale to Ingenix, and as a condition thereto, UHG agreed to become a member of HIAA.

91.     This chain of events demonstrates how Defendants and Co-Conspirators, through HIAA, conspired and agreed to create, expand, continue, promote and use the Ingenix Database to control and set ONET UCR rates among and between Defendants with the ultimate aim of setting ONET reimbursements at below true market levels.

92.     The agreement between Defendants and their Co-Conspirators, and Ingenix, to create and control the data used to establish ONET UCR rates persists today.

---

[3]     During 2005, IHC did not own IAC, and the two entities were joint venturers in overseeing the management of Health Plan Administrators, Inc. ("HPA"), owned 80% by IHC and 20% by IAC as of January 5, 2005.  Scott Wood subsequently and simultaneously served as Chief Operating Officer of IAC and Chief Executive Officer of HPA.  IAC's contributions to this venture included "a broad mix of integrated cost containment services… to deliver value added results to insurers' bottom lines."   One of these "integrated cost containment services" was application of the Ingenix Database to ONET claims.  This arrangement continued during the Class Period.

93.     Based on its 1998 agreement with HIAA and continuing today, Ingenix gives discounts for supplying it the four claims data points described above, which it then scrubs to arrive at the False UCR rates.  Insurance companies, including Defendants, contract with Ingenix to create and provide UCR rates they can use to under-reimburse ONET healthcare claims.

94.     As a condition of obtaining uniform pricing schedules from Ingenix, Ingenix, Defendants and the Co-Conspirators enter into confidentiality and non-disclosure agreements whereby Defendants and the Co-Conspirators agree not to reproduce any data submitted to Ingenix to any other group seeking to develop a competing database.  These confidentiality and non-disclosure contracts help conceal the agreement to artificially depress ONET reimbursements as well as the role each Defendant and Co-Conspirator has played under that agreement.

95.     IAC and the Co-Conspirators have ample opportunity to, and do, communicate through HIAA (now AHIP) and regularly share ONET UCR pricing information using Ingenix as a conduit and switch.

96.     Defendants and the Co-Conspirators understand the UCR rates received from Ingenix are flawed and will cause them to under-reimburse ONET claims.

97.     Defendants and the Co-Conspirators continue to provide input on the types of data gathered by Ingenix, and jointly produce ONET UCR data and rates with and through Ingenix.

98.     Defendants and each Co-Conspirator continue to use the Ingenix Database, which has become a centrally-set pricing schedule, to calculate ONET reimbursements.

99.     During 2005, HIAA considered adding certain clarifying data elements to the contributed data.  However, HIAA member Co-Conspirators understood, and ultimately agreed,

that Ingenix would instead continue to base the Ingenix Database on the same insufficient data points it had always used.

100.    Ingenix informs Defendants and their Co-Conspirators that it does not endorse, approve or recommend use of its database to set ONET UCR rates.   Nonetheless, Ingenix provides Defendants and their Co-Conspirators a uniform pricing schedule (i.e., UCR rates) twice a year and promises them a 16:1 return on their Ingenix Database investment.   The only purpose of the uniform pricing schedule is to set and pay artificially low ONET reimbursements.

101.    To prevent transparency and inhibit price competition, neither Defendants nor Co-Conspirators disclose that they contract with Ingenix, contribute data to Ingenix, or use UCR rates provided by Ingenix.   They do not disclose how they and Ingenix arrive at UCR rates, that Ingenix disseminates the UCR rates they use to calculate ONET reimbursements, or that those UCR rates are based on faulty data.

102.    Defendants' and Co-Conspirators' scheme to manipulate UCR rates to under-reimburse ONET claims is predicated, in part, on keeping the Ingenix Database and its inherent flaws a complete secret from Plaintiff and the Classes.   To do so, Defendants and Co-Conspirators actively conceal the true UCR rates from Plaintiff and the Classes, knowing the success of the scheme will be jeopardized if any one of them discloses or pays the true UCR rates.

103.    Rather than disclose the defective nature of the Ingenix Database and participation by Defendants and Co-Conspirators in creation of the flawed UCR rates, Defendants and Co-Conspirators shield these facts from Plaintiff and the Classes through material misrepresentations and omissions.

D.     THE NEW YORK ATTORNEY GENERAL'S INVESTIGATION OF THE
       INGENIX DATABASE

104.   In an investigation into the flawed Ingenix Database conducted by the Attorney

General of the State of New York, Andrew M. Cuomo, Mr. Cuomo concluded that "the Ingenix

databases in fact under-reimburse consumers."  State of N.Y. Office of the Att'y Gen., Health

Care Report: The Consumer Reimbursement System is Code Blue (January 13, 2009).

105.   According to the Attorney General's report, an analysis of the New York City

market showed that insurers using the Ingenix Database and similar products to determine UCR

"systematically under-reimburse New Yorkers for doctor's office visits."  Id.

106.   "When extrapolated across the State and the country, it is fair to say that the

Ingenix databases have caused Americans to be under-reimbursed to the tune of at least hundreds

of millions of dollars over the past ten years."  Id.  Plaintiff and the Classes are direct victims of

this under-reimbursement scheme.

107.   Plaintiff and the Classes have been harmed by the pervasive under-reimbursement

scheme by disruption of their physician–patient relationships.   According to the Attorney

General:

>        The responsible consumer reads the plan documents and sees a
>        thicket of words. One term seems intelligible: the "usual and
>        customary rate" of a similar physician for a similar service in a
>        similar area. That sounds reasonable. The consumer makes the leap
>        out-of-network and submits the bill to the insurer, only to be told
>        the consumer will not be fully reimbursed because the doctor's
>        charge exceeded the usual and customary rate. The fog of
>        ignorance continues, thanks to the insurer. The physician-patient
>        relationship is undermined, as the physician has been branded a
>        charlatan whose bills are inflated. No one's interests here are
>        advanced, except perhaps when next time, the consumer decides to
>        stay in network for fear of what bills may accrue for out-of-
>        network care. The interests advanced in that event are those of the
>        insurer, whether by accident or design.

Id.

108.    Discussing where blame for this under-reimbursement scheme lies, the Attorney General explained: "[T]he fault cannot be laid on Ingenix alone. All industry members have benefited unfairly at the expense of consumers over the past ten years, and they continue to benefit unfairly from a rigged system day after day."   Id.   Defendants, as significant use beneficiaries of the Ingenix Database, should be held accountable for using it to under-reimburse Plaintiff and the Classes.

109.    Simultaneous with release of these NYAG findings, UHG, the ultimate and controlling owner of the Ingenix Database, has agreed to settle all claims against it, centering on the Ingenix Database and UCR reimbursements, with the NYAG and the American Medical Association ("AMA"), among others.   The AMA civil settlement agreement remains pending. As part of the NYAG settlement, UHG agreed to pay the NYAG approximately $50 million. These funds are earmarked to create an independent non-profit organization, managed principally by Syracuse University, that will create, own and operate a new UCR claims database, to be used for correct UCR determinations.   This new database will be designed to replace the Ingenix Database.

110.    Although the first, UHG was not the only health insurer to settle claims with the NYAG concerning wrongful use of the Ingenix Database.   Use of the Ingenix Database is so widespread that several insurers settled similar claims with the NYAG, in what has become an historic effort to begin overhaul of the nation's out-of-network healthcare reimbursement system. On January 15, 2009, the NYAG announced a similar settlement with Aetna for $20 million; on February 4, 2009, the NYAG announced a settlement with MVP Health Care, Inc. for $535,000; on February 10, 2009, the NYAG announced a settlement with Independent Health for $475,000 and HealthNow New York, Inc. for $212,500; on February 17, 2009, the NYAG announced a

settlement with CIGNA for $10 million; on February 18, 2009, the NYAG announced a settlement with WellPoint, Inc. for $10 million; on March 3, 2009, the NYAG announced a settlement with Guardian Life Insurance Company of America for $500,000; and on March 5, 2009, the NYAG announced a settlement with Excellus Health Plan for $775,000 and Capital District's Physician Health Plan for $300,000.  The funds from each of these settlements will be paid to the qualified non-profit organization at Syracuse University, charged with establishing the new and independent claims database for ONET UCR reimbursement rates.

### E.  THE UNITED STATES SENATE'S INVESTIGATION OF THE INGENIX DATABASE

111.  The United States Congress is actively investigating use of the Ingenix Database to set ONET UCR amounts.  The Senate Committee on Commerce, Science, and Transportation recently held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?"  The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for ONET claims; specifically, how the industry calculates UCR rates for ONET healthcare providers.

112.  At the March 31, 2009 hearing, Senator and Committee Chairman John D. Rockefeller, IV, speaking for a majority of the Senate Committee, explained why they believed the insurance industry's practices were "deceptive."  Mr. Rockefeller noted that more than 100 million Americans pay for health insurance intended to give "them the option of going outside of their provider networks for care," but the insurance companies are not living up to their end of the bargain:

> Let's be very clear about this.  The insurers aren't letting their policyholders see non-network doctors out of the goodness of their hearts.  Consumers are paying for this option - through higher premiums and higher cost sharing.  There are many reasons

American consumers decide to pay the extra money for health insurance with an out-of-network option.   One New York consumer we heard from last week, Dr. Mary Jerome, said she paid extra for the "peace of mind" that she could get the best care available when she really needed it.

What we learned at our first hearing was that while consumers held up their side of the bargain, the insurers did not.  The insurance industry promised to base their out-of-network payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area.  Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

113.   Senator Rockefeller specifically addressed the New York Attorney General's findings about the insurance industry's wrongful use of the Ingenix Database:

In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates.   A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates.   Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers.  For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying.  The source of the skewed data was Dr. Slavitt's company, Ingenix.

114.   Due to the insurance industry's fraudulent use of the Ingenix Database, the Senate Committee is now evaluating whether more federal oversight and regulation of the insurance industry is necessary.  Today, however, the only means of redress for insureds such as Plaintiff and the Classes is through the federal courts.

### F.   DEFENDANTS' OTHER WRONGDOING

#### 1.   Deductible and Out-Of-Pocket Limits

115.   FSL's obligation to pay health benefits arises once a plan participant or beneficiary has satisfied his or her annual deductible amount, which is specified in their health benefit plan document. In addition, when a Member (insured individual) reaches the benefit

plan's specified out-of-pocket limit for the year, FSL's obligation to pay benefits engages.  The out-of-pocket limit is referred to in a FSL Member's plan as the "maximum out of pocket" and will be so referred to here.  Once a Member's allowed amounts for services, in total, reach the maximum out of pocket specified in their plan document, the Member has no further obligation to pay any share of coinsurance. So, for example, when the total of allowed amounts is below $4,000, FSL is obligated to pay (the lower of the billed charge, or) 50% of UCR, and a Member is obligated to pay coinsurance of 50%.  After a Member's allowed amounts for a calendar year total at least $4,000 or more, FSL must pay 100% of UCR, and a Member's coinsurance obligation concludes for that calendar year.

116.    By the terms of the FSL Certificate of Group Insurance governing Plaintiff's health plan, the allowed amount is the lesser of the provider's actual charge or the UCR. Any amount of the billed charge above UCR does not count toward either the Member's deductible or the Member's coinsurance charge limit.  If the UCR is lowered improperly, then the Member's amounts counted toward their deductible and/or their coinsurance charge limit, based on such UCR, are also too low.  This creates a double penalty against Plaintiff and the Classes.

117.    IAC, as TPA for FSL, calculated Plaintiff's and Class members' deductible and their maximum out of pocket obligations using inappropriately reduced UCR amounts, and failed to credit the difference between the actual charge and the allowed charge to the deductible or to the maximum out of pocket.  FSL therefore pays too little of the claim (50% of the improperly reduced UCR), while the Members remain financially responsible for too large a portion of the claim (50% of UCR, plus the difference between the billed amount and the allowed charge).

### 2.    Failure to Pay Interest

118.    Defendants have improperly reduced or caused to be reduced FSL's ONET reimbursements by violating the terms of Plaintiff's and Class members' healthcare plans, and

Defendants owe restitution to Plaintiff and Class members of the improperly denied amounts, and interest on such amounts.

### G.     PLAINTIFF WAS UNDERPAID BY FSL ON CLAIMS ADMINISTERED BY IAC AND HAS EXHAUSTED HER APPEAL RIGHTS

119.    Plaintiff Jane McCarthy's benefits were determined under FSL's Multiple Unit Security Trust II Plan, which is a fully-insured welfare benefit plan governed by ERISA. Defendants provided Plaintiff a Certificate of Group Insurance ("COGI") setting forth in truncated detail the terms of her plan.

120.    Plaintiff alleges that Defendants relied on flawed and inappropriate data to make UCR determinations for her ONET benefits using the Ingenix Database.  By relying on such improper data to make UCR determinations, Defendants breached their duties as set forth in FSL's ERISA-governed plan and, as a result, they should be required to reimburse those Members who received reduced ONET benefits.

121.    Plaintiff suffered improper UCR benefit reductions made by Defendants in 2007 after she received health care services from Dr. Alex Keller, M.D., F.A.C.S. (also referred to herein as "Plaintiff's ONET provider").   On November 6, 2007, the date when Dr. Keller provided covered services to Plaintiff, Dr. Keller was an ONET provider as to FSL.  Dr. Keller submitted a claim to FSL on Plaintiff's behalf in the amount of $48,000.00 in compliance with the terms of Plaintiff's health care plan, seeking payment of benefits as required under her FSL Multiple Unit Security Trust II Plan.  The relevant medical procedure was one of unusual difficulty, length and rarity, and had an expected outcome distinct from and superior to the procedure represented by the relevant unmodified CPT code.

122.    IAC acknowledged receipt of those charges in behalf of FSL, by letter dated December 9, 2007, and assigned them claim number 2007333-P00-015.  IAC subsequently

issued, and Plaintiff received, an EOB ("Explanation of Benefits") dated January 15, 2008, concerning Dr. Keller's services.  FSL and IAC intended Plaintiff to rely upon the truth and accuracy of such EOB, which she did to her detriment.  The EOB set forth, *inter alia*, that IAC allowed $20,191.50 and excluded $27,808.50 of Dr. Keller's charges from reimbursement, leaving Plaintiff obligated to pay Dr. Keller the entire unreimbursed amount.  The EOB stated that Dr. Keller's charges "exceed[ed] usual/reasonable/customary" for the services rendered.  Dr. Keller billed Plaintiff for the balance unpaid by FSL, and Plaintiff remained liable for the unpaid portion of the bill.

123.   Plaintiff suffered additional improper UCR benefit reductions from Defendants with respect to covered healthcare services performed by Dr. Marie Chen on November 6, 2007.  Such services included acting as an assistant to Dr. Keller with respect to the services performed by Dr. Keller on November 6, 2007.  Dr. Marie Chen was an ONET provider as to FSL when she performed such services.  Dr. Chen submitted a claim to FSL via IAC on Plaintiff's behalf in the amount of $12,300.00,  in compliance with the terms of Plaintiff's health care plan, seeking payment of covered benefits as required under Plaintiff's FSL Multiple Unit Security Trust II Plan.

124.   IAC assigned Plaintiff's claim for Dr. Chen's healthcare services claim number 2008004-RZR-003.  IAC subsequently issued, and Plaintiff received, an EOB dated January 8, 2008, concerning Dr. Chen's services.  FSL and IAC intended Plaintiff to rely upon the truth and accuracy of that EOB, which she did, to her detriment.  The EOB set forth, *inter alia*, that IAC allowed $6,237.00 and excluded from reimbursement $6,063.00 of Dr. Chen's charges, leaving Plaintiff obligated to pay Dr. Chen the entire unreimbursed amount.  The EOB stated that Dr. Chen's charges "exceed[ed] usual/reasonable/customary" for the services rendered.  Dr. Chen

billed Plaintiff for the balance unpaid by FSL, and Plaintiff remained liable for the unpaid portion of the bill.

125.    Plaintiff has made out-of-pocket payments to ONET providers that were in excess of the applicable deductible and coinsurance under her FSL plan.  These sums were paid by Plaintiff due to Defendants' improper ONET benefit reductions detailed herein.

126.    The EOBs mailed to class members by IAC for FSL, regarding its ONET benefit reductions during the Class Periods did not meet legal requirements, including federal claims procedure regulations. The EOBs failed to advise FSL Members of the specific reasons for denial of full payment or the specific plan provisions under which Defendants justified their unilateral benefit reductions.   IAC's EOBs reflecting UCR determinations failed to advise Plaintiff or the class members about the data IAC used to calculate UCR.  Examples of IAC's omissions of required disclosures on EOBs include the following:

- Absent or inadequate "Notes" describing Defendants' benefit reductions and failure to provide the required "specific" reasons for the disallowed amounts above the False UCR;

- The particular fee schedule or data or methodology used to determine UCR;

- Incomplete information about the appeal process and appeal rights;

- The characteristics (resulting in invalidity) of the Ingenix Database used to determine UCR;

- The disclaimer that accompanies Ingenix data;

- Ingenix's manipulations of the data from all contributors to the Ingenix Database; and

127.    On March 12, 2008, Plaintiff's ONET provider sent a letter to IAC on her behalf appealing the reduction of her benefits with respect to the healthcare services performed by Drs. Keller and Chen on November 6, 2007.  In its letter response dated March 21, 2008, IAC cited

the provisions of Plaintiff's plan document defining necessary, reasonable and customary charges, acknowledging Plaintiff's right to a provider of her choice, and explaining FSL's policies regarding compensation of charges by in-network providers as opposed to charges by out-of-network providers.  IAC gave no information whatsoever beyond recitals of Plaintiff's plan document summary text regarding how the amount of necessary, reasonable and customary charges was determined.

128.    On March 21, 2008, Plaintiff's ONET provider sent another letter to IAC on Plaintiff's behalf making further appeal.  In its letter response dated April 16, 2008, IAC justified its reduction of ONET benefits by stating that "In review of the zip code billed, procedure codes and type of surgical charges filed, it has been determined that these charges were subject to the Usual, Reasonable and Customary fees for your geographical area and processed according to the aforementioned definitions and policy provisions correctly."  This recital relies on three of the four data points collected by Ingenix, and includes no substantive justification.

129.    On June 5, 2008, Plaintiff's ONET provider sent a letter to IAC on Plaintiff's behalf requesting a second level appeal.  IAC treated the resulting appeal as a third and final appeal under Plaintiff's plan.  IAC's letter response dated June 23, 2008 included review of Plaintiff's file by an Independent Medical Consultant board certified in a relevant discipline, but apparently unfamiliar with the difficulty, length or rarity of the particular services received by Plaintiff.  IAC upheld its own determinations, relying on the Ingenix Database-given UCR as based on the unmodified CPT procedure code for the procedure performed on Plaintiff, as well as the Independent Medical Consultant's recommendations.  IAC informed Plaintiff by letter dated July 28, 2008 and mailed through the United States Postal Service, that this appeal exhausted her IAC-internal appeal rights, and that Plaintiff had the right to continue her appeal

by contacting the Director of Insurance of the State of Nebraska.  IAC did not remind Plaintiff of her statutory rights under ERISA, which she is now exercising.

130.    The information Defendants provided to Plaintiff in her appeal process is false and misleading.  It also omits material information that Defendants should have provided as fiduciaries.

131.    Following a letter from Plaintiff's ONET provider on her behalf dated August 1, 2008, complaining to the Nebraska Department of Insurance ("NDI") about IAC's improper benefit reductions, the NDI initiated an investigation into the reductions on August 8, 2008. During such investigation, in an August 26, 2008, letter to the NDI, FSL admitted it used the Ingenix Database to determine payment amounts on Plaintiff's claims and that "These claims were processed at the usual, reasonable and customary (U&C) allowed amount **that is programmed into the system** for non-PPO providers." (Emphasis added.)

132.    FSL knew when it sent this letter that the Ingenix Database does not reflect a true "usual, reasonable and customary (U&C) allowed amount…"   These statements constituted misrepresentations by FSL and IAC to their regulator.

133.    FSL also knew that its ONET reimbursements administered by IAC were not, as alleged in its August 26, 2008, letter, "based on the specific procedure or service performed (CPT code) and the geographical area where the procedure is performed."

134.    Another letter FSL sent through the United States Postal Service to the NDI investigator, dated September 15, 2008, stated "The [Independent Medical Consultant] reviewed the coding and the allowed amounts and determined the amounts were consistent with IAC's database."  FSL gave no further explanation of the Independent Medical Consultant's rationales or determinations.

135.    A further letter from FSL to the NDI investigator, dated September 29, 2008, and mailed through the United States Postal Service, stated that "Your [the investigator's] letter dated September 16, 2008 includes a request to provide a list of PPO physicians that perform the exact same [procedure] Ms. McCarthy underwent…"   The Defendants failed and refused to comply with such request, providing only "a list of Midlands Health Providers that specialize in Plastic and Reconstructive surgery within 100 miles of Ms. McCarthy's zip code."

136.    The information Defendants provided to Plaintiff and to their regulators during her appeals is false and misleading.  It omits material information that Defendants should have provided as fiduciaries.  Defendants knew when they mailed each of their appeal response letters, both to Plaintiff's ONET provider and to the NDI investigator, that the Ingenix Database does not reflect true "necessary, reasonable and customary" charges.

137.    Plaintiff's case was referred by the NDI to the Mississippi Department of Insurance because Mississippi is the situs where the group policy covering Plaintiff was issued. NDI sent a letter notice to Plaintiff of this transfer, dated October 8, 2008.

138.    The Mississippi Department of Insurance notified Plaintiff, by letter dated January 29, 2009, that it was unable to cause Defendants to increase their payment on Plaintiff's claims.

## H.    DEFENDANTS' MISREPRESENTATIONS AND FRAUDULENT CONCEALMENT OF THE TRUTH

139.    To calculate their UCR reimbursement amounts for ONET claims, Defendants and their Co-Conspirators use the Ingenix Database.  The Ingenix Database functions as a data-laundering mechanism:   Ingenix utilizes billing information provided by its parent company (UHG) and other health insurance companies, including Defendants, to calculate UCR rates

which health insurers, including the entities which contributed the claims data, then use to reimburse their Members' ONET claims.

140.    Defendants and their Co-Conspirators agreed through various contract and licensing agreements to use the flawed data incorporated into the Ingenix Database, thereby yielding artificially low UCR rates, resulting in artificially low ONET reimbursements and higher out-of-pocket expenses for Members, including Plaintiff and the Classes.

141.    Defendants and their Co-Conspirators jointly produce these False UCRs.  Ingenix compiles and administers the Ingenix Database while Defendants and their Co-Conspirators provide the raw data necessary for the Ingenix Database, as the benchmark for the False UCRs, which in turn are used by Defendants to determine their own ONET reimbursements.

142.    Defendants represent through their Member advertising, insurance certificates and plan documents that they will permit their Members to choose between in-network and out-of-network providers and that Members will be reimbursed based on the UCR for ONET claims. Nevertheless, Defendants do not reimburse ONET claims based on the true UCR; they use reimbursement rates they know are skewed downward, thereby increasing Members' ONET costs and denying them a free choice between in-network and ONET providers.   By affirmatively misrepresenting the level of ONET reimbursement and the extent to which Members can choose between in-network and ONET providers, and by failing to disclose that ONET reimbursements are calculated from False UCRs, Defendants have deceived Plaintiff and the Classes.

143.    The relationships between Defendants, their Co-Conspirators and Ingenix evidence inherent conflicts of interest that directly harm all Class members, including FSL Members.   These conflicts inhibit construction of the rigorously defined and audited claims

database necessary to determine fair and accurate UCR rates.  Insurers who have a contract with Ingenix are self-motivated to provide flawed claims data that will yield lower UCR rates, in order to thereafter enjoy lowered ONET reimbursement obligations.  Ingenix also offers its data contributors free licenses to the Ingenix Database.  This arrangement creates another incentive to scrub the contributed claims data, and highlights the self-interested, collusive and unlawful nature of this scheme.  Defendants and their Co-Conspirators have no incentive to prevent or investigate any risk of downward-skewed, inaccurate claims data.  In fact, Ingenix provides incentives to do the opposite.  By turning a blind eye to the quality and reliability of contributed data,, and then manipulating that data to lower UCR rates, Ingenix helps its parent UHG lower its own ONET reimbursements (up to 10% of all claims submitted to UHG are ONET), and maintains its own dominant market position as ONET claims data provider.

144.    Defendants and their Co-Conspirators know the success of this high-profit scheme will be jeopardized if anyone discloses the significantly higher true ONET claims data. Defendants and their Co-Conspirators operate Ingenix as a "black box", such that Members of Defendants' health plans, including Plaintiff, have no practical ability to find out how Ingenix calculates UCR rates.  Defendants do not disclose that they use Ingenix to calculate the UCR rate, nor that they contribute claims data to Ingenix, nor that Ingenix is wholly owned by an insurance company.

145.    Each Defendant and Co-Conspirator concealed its fraudulent conduct from Plaintiff and the Classes.  Defendants and their Co-Conspirators also prevented Plaintiff and members of the Classes from knowing or discovering the methods by which Ingenix determines its UCR rates.  As summarized in the Senate Report, Dr. Nancy Nielson, President of the AMA, testified, "when doctors asked insurers how they had calculated their 'usual and customary'

rates, they were told that information was 'proprietary.'"   Moreover, the fraudulent conduct alleged herein was of a self-concealing nature.

146.    Today, the vast majority of health insurers have agreed to use the Ingenix Database to determine UCRs for reimbursing ONET claims.   UHG promotes the Ingenix Database as the "industry standard" to determine UCRs.   Insurance companies use the Ingenix Database to imbue their downward-skewed ONET reimbursements with an appearance of legitimacy and accuracy.   In Plaintiff's plan documents, FSL repeats this "industry standard" advertising line in its definition of "necessary, reasonable and customary".   Just because something has become "standard", does not mean it is either true or correct.   The source must be considered.

147.    Selection and purchase of health insurance are vitally important to consumers. They are entitled to accurate information in that process.   Considering the punitive cost of health insurance for families, consumers should be entitled to receive full value for their premiums.

148.    Plaintiff and Class members paid for ONET coverage, obtained ONET services, and had a right to a fair and accurate calculation of ONET reimbursement by Defendants.

149.    Any applicable statutes of limitations have been tolled by Defendants' and their Co-Conspirators' knowing and active concealment and denial of the facts alleged herein. Defendants and their Co-Conspirators went to great lengths to conceal the existence of the conspiracy and its material terms.

150.    Defendants and their Co-Conspirators were, and continue to be, under a continuing duty to disclose to Plaintiff and the Classes the fact that their ONET reimbursements were based on UCR rates that bore, and continue to bear, little relationship to actual  UCR charges for those medical expenses.   Because of their knowing, affirmative, and/or active

concealment of the fraudulent nature of their ONET reimbursements, Defendants and their Co-Conspirators are estopped from relying on any statutes of limitations.

## IV.  CLASS ACTION ALLEGATIONS

### A.  Class Definitions

151.  Plaintiff Jane McCarthy brings this action on her own behalf and on behalf of an "ERISA Class," defined as:

> All persons who are, or were, from January 1, 1999, to the final termination of this action ("ERISA Class Period"), Members in any group healthcare plan insured either by lower-level or stop-loss coverage issued by FSL, subject to ERISA, who received hospital or medical services or supplies within the boundaries of the United States of America from an ONET provider (or any provider FSL considered ONET for purposes of benefit reimbursement) for which FSL, or any third party acting on behalf of FSL, allowed less than the provider's billed charge due to a benefits determination by FSL or such third party based on use of the Ingenix Database.

152.  Plaintiff brings this action on her own behalf and on behalf of a "RICO Class," defined as:

> All persons who are, or were, from January 1, 1999, to the final termination of this action ("RICO Class Period"), Members in any healthcare plan (ERISA or non-ERISA) insured either by lower-level or stop-loss coverage issued by FSL, and who received hospital or medical services or supplies within the boundaries of the United States of America from an ONET provider (or any provider FSL considered ONET for purposes of benefit reimbursement) for which FSL, or any third party acting on behalf of FSL, allowed an amount less than the provider's billed charge due to a benefits determination by FSL or such third party based on use of the Ingenix Database.

153.  Plaintiff further brings this action on her own behalf and on behalf of a "RICO Section 664 Subclass," defined as:

> All persons who are, or were, January 1, 1999, to the final termination of this action ("RICO Section 664 Subclass Period"), Members in any healthcare ERISA plan  insured either by lower-

level or stop-loss coverage issued by FSL, and who received hospital or medical services or supplies within the boundaries of the United States of America from an ONET provider (or any provider FSL considered ONET for purposes of benefit reimbursement) for which FSL, or any third party acting on behalf of FSL, allowed an amount less than the provider's billed charge due to a benefits determination by FSL or such third party based on use of the Ingenix Database.

**B.**     **Common Class Claims, Issues and Defenses**

154.    The following common class claims, issues and defenses for Plaintiff and the Classes have arisen during the respective Class Periods:

a.    Whether Defendants' use of the Ingenix Database to calculate UCR in determining ONET reimbursement breached Defendants' legal obligations to FSL Members' group health plans;

b.    Whether Defendants' ONET benefit reductions described in this Complaint violated ERISA or other applicable law;

c.    Whether ERISA requires each Class member to prove exhaustion of administrative remedies or otherwise provide a basis for excusing exhaustion before seeking relief;

d.    Whether Defendants' alleged fiduciary violations, if proved, justify injunctive relief;

e.    Whether Class members (including those who assigned their claims) may recover unpaid welfare benefits;

f.    Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid welfare benefits under ERISA;

g.    Whether Defendants' benefit claims review procedures comply with ERISA;

h.     The standard of review applicable to Defendants' ONET benefit reductions;

i.     The identity and scope of the ERISA and non-ERISA plans subject to this Complaint;

j.     Whether Defendants violated their fiduciary or other duties owed to FSL Members when they made ONET benefit reductions or engaged in other conduct alleged in this Complaint;

k.     Whether IAC's EOBs and other communications on behalf of FSL with FSL Members violated ERISA or other applicable law;

l.     Whether the Court's interpretation of the ERISA plans at issue must be guided by state regulators' interpretations of those plans;

m.     What are the applicable statutes of limitations periods for Class members' claims, and whether Defendants' concealments of material fact bar Defendants from asserting any statute of limitations;

n.     Whether Defendants' calculation of FSL Members' deductible and out-of-pocket ONET amounts violate ERISA plan language and applicable law;

o.     Whether Defendants engaged in a pattern of racketeering activity, as defined by RICO, by and through an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprising Defendants and Ingenix as described in this Complaint;

p.     Whether Defendants and their Co-Conspirators engaged in a pattern of deceptive conduct toward Plaintiff and the RICO Classes' members;

C.     **Additional Class Action Allegations**

155.   The members of the Classes are so numerous that joinder of all members is impracticable. Upon information and belief, the Classes consist of more than one hundred

thousand FSL Members in commercial group health plans insured or offered by FSL. The precise number of members in the Classes is within FSL's custody and control.  The numerosity requirement of Rule 23 is easily satisfied for the Class.

156.    Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Classes, including the class action claims, issues and defenses listed above.

157.    The named Plaintiff's claims are typical of the claims of the Class members because, as a result of the conduct alleged herein, Defendants breached their respective statutory and contractual obligations to Plaintiff and the Classes through and by the uniform patterns or practices described above.

158.    Plaintiff will fairly and adequately protect all Classes' members' interests.  She is committed to vigorous prosecution of this action, has retained counsel competent and experienced in class action litigation and in the prosecution of ERISA and RICO claims, and she has no interests antagonistic to or in conflict with those of the Classes. For these reasons, Plaintiff is an adequate class representative.

159.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications that could establish incompatible standards of conduct for Defendants.

160.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable. Further, because the unpaid benefits denied individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members individually to redress the harm done to them.   Defendants maintain computerized claims

## V.  CAUSES OF ACTION

<u>COUNT I</u>

**CLAIM FOR UNPAID BENEFITS UNDER WELFARE BENEFIT PLANS GOVERNED
BY ERISA AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF**
(On Behalf of Plaintiff and the ERISA Class)

161.    The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.  Plaintiff asserts this claim on her own behalf and on behalf of the ERISA Class members.

162.    FSL must pay benefits to FSL Members who are insured by FSL pursuant to the terms of their ERISA welfare benefit plans and in compliance with applicable federal and state laws.

163.    IAC must properly administer FSL plans (to the extent it is contracted by FSL to administer such plans) pursuant to the terms of such ERISA plans and in compliance with applicable federal and state laws.

164.    Defendants violated their legal obligations under ERISA-governed plans and federal common law each time they made the ONET benefit reductions described in this Complaint, including violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

165.    Where any Defendant acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion over plan participant benefits, or determines final welfare benefit appeals, such Defendant is liable to affected ERISA Class members for those unpaid benefits.

166.     Defendants' omissions and lack of disclosure to FSL Members violated their legal obligations.   Defendants violated these obligations each time they engaged in conduct that discouraged or penalized their Members' use of ONET providers, such as by making improper ONET benefit reductions.   Defendants, as parties who exercised discretionary authority and control over administration of Plaintiff's plan and other ERISA Class members' plans, including management and disposition of benefits under the terms of the plan, owed a fiduciary duty to Plaintiff and each putative ERISA Class member.

167.     Defendants breached their fiduciary duties to Plaintiff and each ERISA Class member by, without justification, failing or causing failure to pay proper ONET benefits. Defendants therefore owe - and should be ordered to pay - the benefits improperly denied under the plans detailed herein.   Plaintiff, on her own behalf and on behalf of the ERISA Class, seeks unpaid benefits, recalculated deductible and coinsurance amounts, and interest back to the date the affected claims were first submitted to IAC or FSL.   Plaintiff also sues for declaratory and injunctive relief, including enforcement of the ERISA plan terms and to clarify their rights to future benefits.   Plaintiff requests attorneys' fees, costs, prejudgment interest and other appropriate relief against all Defendants.

## COUNT II

### FAILURE TO PROVIDE AN ACCURATE SPD AND COGI AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf of Plaintiff and the ERISA Class)

168.     The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.   Plaintiff asserts this claim on her own behalf and on behalf of the ERISA Class members.

169.     IAC's disclosure obligations under ERISA include furnishing accurate materials summarizing its administered group health plans, known as an SPD (Summary Plan

Description), and accurate materials detailing such administered group health plans, referred to by Defendants as a Certificate of Group Insurance ("COGI"), under 29 U.S.C. § 1022, and supplying accurate SPDs, COGIs and other information as required (and actionable) under 29 U.S.C. § 1132(c).

170.   Defendants' failure to disclose material information about their ONET benefit reductions; their contribution of skewed data to Ingenix; their later licensing and use of such data; and their material changes in plan benefit policies without disclosure to plan participants, all and each violated ERISA.

171.   Throughout the ERISA Class Period, Plaintiff and ERISA Class members have been proximately harmed by IAC's and FSL's failure to comply with 29 U.S.C. § 1022 and 29 U.S.C. § 1024(b)(4), federal regulations, and federal common law, and are entitled to appropriate relief under ERISA, including injunctive and declaratory relief to remedy Defendants' continuing violation of these provisions.

<u>**COUNT III**</u>

**<u>VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE CARE</u>**
**<u>AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**
**<u>(On Behalf of Plaintiff and the ERISA Class)</u>**

172.   The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.  Plaintiff asserts this claim on her own behalf and on behalf of the ERISA Class members.

173.   Throughout the Class Period, Defendants acted as "fiduciaries" to Plaintiff and ERISA Class members, as that term is understood under 29 U.S.C. § 1002(21)(A).

174.   As ERISA fiduciaries, Defendants owed, and owe, Members in ERISA plans a duty of care, defined as an obligation to act with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of a like enterprise.  ERISA fiduciaries must also

act in accordance with the documents and instruments governing the welfare benefit plan.  29 U.S.C. § 1104(a)(l)(B) and (D).  In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the plan, Defendants violated their fiduciary duty of care to ERISA Class members.

175.    As ERISA fiduciaries, Defendants owed and owe ERISA Class members a duty of loyalty under 29 U.S.C. § 1106, defined as an obligation to make decisions in the interest of ERISA Class members and to avoid self-dealing or financial arrangements that benefit Defendant at the expense of ERISA Class members.  Defendants cannot, for example, make benefit determinations for the purpose of saving money at the expense of ERISA Class members.

176.    Defendants violated their fiduciary duties of loyalty and due care by, *inter alia*, making ONET benefit reductions that were unauthorized by SPDs and COGIs; failing to inform ERISA Class members of flaws in the Ingenix Database that make its use in calculating UCR reimbursement inappropriate; making false representations regarding their ONET benefit reductions; failing to credit deductibles and out-of-pocket maximums properly; changing their benefit practices without advance disclosure to ERISA Class members; failing to properly credit deductible and out of pocket maximums; misrepresenting facts to regulators; failing to disclose in preauthorizing services that Defendants' ONET reimbursement practices would leave the ERISA Class member financially responsible for the bulk of the "approved" service; and violating federal law.

177.    Where Defendants act as fiduciaries or perform discretionary benefit determinations or otherwise exercise discretion, or determine final benefit appeals, Defendants are liable for underpaid benefits to Plaintiff and the ERISA Class members.

178.   Defendants also violated their fiduciary duties by using SPDs that did not comply with federal law.

179.   Defendants breached their fiduciary duties by sending inaccurate and misleading EOBs and other communications to Plaintiff and the ERISA Class members.

180.   Plaintiff and ERISA Class members are entitled to assert a claim for relief for Defendants' violation of their fiduciary duties under 29 U.S.C. § l132(a)(3), including for injunctive and declaratory relief and Defendants' removal as breaching fiduciaries.

### COUNT IV

**FAILURE TO PROVIDE FULL & FAIR REVIEW AS REQUIRED BY
ERISA AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
(On Behalf of Plaintiff and the ERISA Class)**

181.   The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.  Plaintiff asserts this claim on her own behalf and on behalf of the ERISA Class members.

182.   IAC functioned as the "plan administrator" - within the meaning of such term under ERISA - for Plaintiff.  During the Class Period, Plaintiff and the ERISA Class were entitled to receive a "full and fair review" of all claims denied by IAC in behalf of FSL, and are entitled to assert a claim under 29 U.S.C. § 1132(a)(3) for failure to comply with these requirements.

183.   Although Defendants were obligated to do so, they failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Plaintiff and ERISA Class members by making ONET benefit reductions that are inconsistent with or unauthorized by the terms of ERISA Class members' SPDs and COGIs, as well as by failing to disclose data, methodology and other critical information relating to their ONET benefit reductions.

184.     ERISA sets forth minimum standards for claim procedures, appeals, notice to plan participants and the like. In engaging in the conduct described herein, including use of an invalid database for determining UCR rates, incorrect calculation of deductibles and out-of-pocket maximums, false pre-authorization letters, and making other systematic benefit reductions without disclosure or authority under the plans, Defendants failed to comply with ERISA, its regulations and federal common law requiring a "full and fair review," failed to provide reasonable claims procedures, and failed to make necessary disclosures to ERISA Class members.

185.     Plaintiff's failed appeals, as alleged in this Complaint, show the futility of exhausting appeals to Defendants. The requirement to exhaust internal appeals under ERISA should, therefore, be deemed to be futile for all ERISA Class members. Throughout the Class Period, Plaintiff and ERISA Class members have been harmed by Defendants' failure to provide a "full and fair review" of appeals under 29 U.S.C. § 1133, and by Defendants' failure to disclose relevant information in violation of ERISA and the federal common law.  ERISA Class members who are still insured by FSL are also entitled to injunctive and declaratory relief to remedy Defendants' continuing violations of these provisions.

<u>**COUNT V**</u>

**<u>FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)</u>**
**<u>BASED ON PREDICATE ACTS OF MAIL AND WIRE FRAUD</u>**
**<u>(On Behalf of Plaintiff and the RICO Class)</u>**

186.     The allegations contained in this Complaint are realleged and incorporated as if fully set forth herein.  Plaintiff asserts this claim on her own behalf and on behalf of the RICO Class members.

187.     At all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

188.    At all relevant times, and as described in this Complaint, Defendants carried out their underpayment scheme to FSL Members in connection with conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of Defendants and Ingenix (the "Defendants-Ingenix Enterprise" or the "Enterprise").

189.    At all relevant times, the Defendants-Ingenix Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

190.    As described in this Complaint, the Defendants-Ingenix Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which Defendants have engaged.  In addition, the members of the Defendants-Ingenix Enterprise function as a structured and continuous unit, and performed roles consistent with this structure.  The members of the Defendants-Ingenix Enterprise performed certain legitimate and lawful activities that are not being challenged in this complaint, including provision of health insurance and benefit plan and claim administration services, which were done for many claims, such as in-network claims, without resort to unlawful practices.  However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data to make ONET UCR determinations.  Aside from legitimate activities carried out by the members of the Defendants-Ingenix Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Complaint including, but not limited to, intentional underpayment of RICO Class members' ONET claims, resulting from known flawed and invalid data.

191.    The purpose of the Defendants-Ingenix Enterprise was to create a mechanism by which Defendants could reduce their benefit payment obligations.  The mechanism used flawed

and invalid data, but did so in ways that RICO Class members would be unable to challenge effectively. In particular, as described herein, the Defendants-Ingenix Enterprise created what appeared to be an appropriate and unassailable database that appeared to report actual ONET charge data; the Ingenix Database was designed to appear valid as a basis for UCR rates when, in fact, it was invalid. Through their roles in the Defendants-Ingenix Enterprise, (i) Ingenix benefited indirectly through the monies saved by UHG, its parent corporation, and directly by receiving contributed claims data free, and license fees through licensing the Ingenix Database; (ii) FSL benefited by reducing the amount of its own ONET reimbursement obligations; and, IAC and IHC benefitted by keeping claims payouts down for FSL, thus retaining FSL as a client and continuing to receive its fees for IAC's TPA services.  Ingenix also used data submitted by data contributors to create other software and data products, the licensing and sale of which directly benefited Ingenix.

192.    As alleged herein, although Ingenix issues a disclaimer to end users of the Ingenix Database, including Defendants, Defendants continued to use the Ingenix Database in a manner directly at odds with the disclaimer.  Ingenix knew its licensees were using the Ingenix Database improperly to set UCR reimbursements.  At the same time it was issuing a disclaimer in an effort to provide itself with legal protection, Ingenix was also promoting the Ingenix Database as a cost-saving mechanism that could save substantial sums for those who used it to make UCR determinations. Thus, Defendants and Ingenix expressly observed the disclaimer in the breach, despite the fact the disclaimer correctly reported that the Ingenix Database could not be used as a basis for UCR determinations.

193.    Ingenix required certifications from its data contributors that purportedly verified they were submitting all available claims data (the four data points) and were not pre-editing or

otherwise manipulating the data prior to its contribution.  Ingenix knew these certifications were invalid because Ingenix Database users were openly not submitting all their data and were pre-editing and manipulating the data prior to submission. The pre-editing and incomplete submission of data to Ingenix benefited Ingenix and users of the Ingenix Database, including UHG (Ingenix's parent company) and Defendants.  Ingenix also failed to conduct any audits or reviews of its contributed data to ensure the data were valid and appropriate.

194.    Ingenix and Defendants knew the Ingenix Database was being used without RICO Class members ever being informed of the disclaimer or the inherent flaws in the Ingenix Database.  For example, Defendants falsely reported to RICO Class members that their benefit reductions were based on UCR rates when, in fact, the benefit reductions were based on the flawed and invalid Ingenix Database that substantially underreported UCR rates. At the same time, Defendants ensured that lawfully required information concerning ONET benefit reductions was not disseminated to RICO Class members, in violation of RICO Class members' SPDs, COGIs and federal law.

195.    Defendants participated in the Defendants-Ingenix Enterprise in order to shift the costs of medical treatment provided by ONET providers from FSL to its Members, to reduce FSL's UCR payments, and to create an appearance of legitimacy for its ONET benefit reductions. Defendants provided false and incomplete information to FSL Members to convert those withheld funds for the Defendants-Ingenix Enterprise's own direct and indirect financial gain, and to discourage FSL Members from using ONET providers.  Because FSL saves money when in-network providers render services, the Defendants-Ingenix Enterprise saved FSL money, and indirectly made money for IAC and IHC, at the expense of FSL Members.  In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR

costs by Defendants and other users of the Ingenix Database, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of Defendants alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

196.   Neither Ingenix nor its parent company, UHG, took steps to audit or otherwise validate the data that Ingenix received from its data contributors.  Ingenix was aware of the prior manipulation of data by data contributors, but allowed it to occur, since it was consistent with Ingenix's goal to underreport ONET UCR rates.

197.   Through its wrongful conduct as alleged herein, Defendants, in violation of 18 U.S.C. § 1962(c), conducted and participated in conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

198.   Defendants, acting through their officers, agents, employees and affiliates, have committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and continue to commit such predicate acts, in furtherance of their underpayment scheme for ONET services, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Such predicate acts include the following:

> (a)      by mailing or causing to be mailed and otherwise knowingly agreeing to the mailing of various materials and information including, but not limited to, materially false and invalid UCR determinations and EOBs, for the purpose of saving FSL money at its Members' expense, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

> (b)      by transmitting or causing to be transmitted and otherwise knowingly agreeing to the transmittal of various materials and information including, but not limited to, materially false UCR determinations and related explanation of such determinations, by means of telephone, facsimile, and the Internet,

in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

199.    As set forth above, Defendants instructed their claims personnel to make ONET benefit reductions that were contrary to law and FSL Members' SPDs and COGIs.  Defendants knew that data contributed to Ingenix was flawed and incomplete, but Defendants continued to use the Ingenix Database anyway.

200.    In furtherance of their underpayment scheme for ONET services, Defendants, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the intentional underpayment to FSL Members by delivering and/or receiving materials, including SPDs, COGIs, EOBs, appeal determinations, and other materials necessary to carry out the scheme to defraud Plaintiff and other FSL Members.

201.    The foregoing communications via U.S. Mail and interstate wire facilities contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Defendants' scheme to defraud described in this complaint.  Further, such communications were used to provide the under-payment scheme for ONET services with an appearance of legitimacy and regularity and/or postpone ultimate discovery and complaint of the under-payment scheme for ONET services, thereby making discovery of the scheme less likely than if no such mailings or wire transmissions had taken place.

202.    The misrepresentations and omissions in these materials have included and include those set forth previously in this complaint.

203.    Plaintiff's FSL COGI, which is the only document that has been provided to Plaintiff identifying the terms of Plaintiff's FSL welfare benefit plan, identifies neither a named fiduciary nor a claims administrator.  As a functional fiduciary with respect to Plaintiff's plan, IAC occupied and occupies a position of trust and it had, and has, a special relationship with FSL Members that requires IAC to accurately represent the terms and conditions of each such FSL welfare benefit plan, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

204.    Defendants knew that FSL Members would reasonably rely on the accuracy, completeness and integrity of disclosures by the Enterprise.  FSL Members did rely to their detriment on misrepresentations and omissions from the Enterprise.

205.    Each such use of the U.S. Mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act.

206.    The above-described acts of mail and wire fraud are related because they each involve common Enterprise members, common ONET claim reimbursement  practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitute the usual practice of Defendants such that they amount to and pose a threat of continued racketeering activity.  Defendants' scheme to defraud is open-ended and not inherently terminable.

207.    The direct and intended victims of the pattern of racketeering activity described previously herein are the FSL individual and group insurance policy beneficiaries and their assignees, and the RICO Class members, whom FSL has underpaid for ONET services.

208.    Plaintiff and RICO Class members were injured by reason of Defendants' RICO violations because they directly and immediately were underpaid benefits. Defendants further

deprived them of the knowledge necessary to challenge such underpayments. Their injuries were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

209.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and RICO Class members are entitled to recover threefold their damages, costs and attorneys' fees from Defendants, and other appropriate relief.

### COUNT VI

**FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**BASED ON PREDICATE ACTS UNDER 18 U.S.C. § 664**
**AS WELL AS MAIL AND WIRE FRAUD**
**(On Behalf of Plaintiff and the RICO Section 664 Subclass)**

210.    Plaintiff incorporates and realleges the allegations above as if fully set forth herein including, but not limited to, the allegations contained in Count V and its description of the Defendants-Ingenix Enterprise.  Plaintiff asserts this claim on her own behalf and on behalf of RICO Class members who are also ERISA Class members, as those terms are defined in this Complaint.

211.    Section 1961(l)(B) of RICO specifically identifies as a predicate act "any act which is indictable under . . . [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. § 1961(l)(B). Section 664 of Title 18, "Theft or embezzlement from employee benefit plan", provides:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

212.     Plaintiff's healthcare plan is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(l)(A), and is otherwise subject to "any provision of Title I of the Employee Retirement Income Security Act of 1974," 29 U.S.C. § 1001, *et seq.*, and is included in this Count.

213.     Plaintiff's healthcare plan is subject to ERISA and is funded by insurance coverage Defendants provide and administer, respectively. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

214.     Plaintiff's governing plan documents warrant that all benefits due under the plans will be paid. By improperly reducing payments on ONET claims, Defendants intentionally caused Plaintiff and RICO Class members who were also ERISA Class members (the "RICO Section 664 Subclass") to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their welfare benefit plans.

215.     Defendants benefited by converting assets from Plaintiff's ERISA plan, which is a fully insured healthcare plan, which IAC administered, and for which FSL paid benefits from its own assets. Whereas these assets should have been held by Defendants in their fiduciary capacity under ERISA and paid to RICO Section 664 Subclass members, Defendants improperly withheld such funds and maintained them as part of FSL's own assets for FSL's own benefit.  IAC improperly prevented payment of benefits to benefit plan participants and beneficiaries, in order to justify its receipt of administrative fees.  Ingenix benefited indirectly through the savings generated by its parent, UHG, and directly through the licensing fees it received from Defendants and other insurers who used the Ingenix Database to violate RICO.

216.    Defendants acted with specific intent to deprive Plaintiff and RICO Section 664 Subclass members their guaranteed benefits, and were sufficiently aware of the facts to know they were acting unlawfully and contrary to the trust placed in them by Plaintiff and RICO Section 664 Subclass members.

217.    Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as guaranteed benefits to its participants and beneficiaries, all for Defendants' direct or indirect benefit.

218.    As set forth above, Defendants concocted multiple schemes to improperly reduce their obligation to make ONET claim reimbursements.

219.    In furtherance of their false payment scheme, Defendants, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to advance all aspects of the false payment scheme by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, EOBs describing UCR determinations, appeal determinations, preauthorization decisions and other materials necessary to effectuate the false payment scheme, as well as to contribute, edit and manipulate the source data for the Ingenix Database.

220.    The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise were incident to an essential part of the false payment scheme.  The mail and wire communications were used to provide the false payment scheme with an appearance of legitimacy and regularity and postpone ultimate discovery of and complaint regarding the false payment scheme.  The mail and

wire communications had the design and effect of preventing a meaningful evaluation and review of Defendants' ONET benefit reductions, and thereby made the discovery of the false payment scheme less likely than if no such mailings or wire transmissions had taken place.

221.    As claims administrator of Plaintiff's welfare benefit plan and similar plans insured by FSL, IAC occupied a position of trust, and it had a special relationship with Plaintiff and RICO Section 664 Subclass members that required it to accurately represent the terms and conditions of their welfare benefit plan, and to disclose all facts about the plan, the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

222.    Each such use of the U.S. Mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

223.    The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common members, common methodologies, common results impacting upon common victims, and a common purpose of executing the false payment scheme, are continuous because they occurred over a significant period of years, and constitute the usual practice of Defendants as to ONET claims, such that they amount to and pose a threat of continued racketeering activity.

224.    The purpose of Defendants' false payment scheme was to underpay the guaranteed benefits to which Plaintiff and RICO Section 664 Subclass members are entitled under their employee welfare benefit plans, and convert those withheld funds for their own direct or indirect financial gain.  Defendants created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiff and RICO Section 664 Subclass members

in order to increase revenue through their respective insurance and claims administration businesses.

225.    The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiff and RICO Section 664 Subclass members, whom Defendants deprived of the complete guaranteed benefits for ONET services, to which they are entitled.

226.    Defendants' RICO violations injured Plaintiff and RICO Section 664 Subclass members by depriving them of guaranteed benefits under their claims for ONET reimbursement, as well as the knowledge necessary to challenge the false and manipulative UCR determinations. Their injuries were proximately caused by violations of 18 U.S.C. § 1962(c), as these injuries were the foreseeable, direct, intended and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts), and but for Defendants' RICO violations (and commission of underlying predicate acts), Plaintiff and RICO Section 664 Subclass members would not have suffered such injuries.

227.    As a result of their misconduct, Defendants are liable to Plaintiff and RICO Section 664 Subclass members in an amount to be determined at trial.

228.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and RICO Section 664 Subclass members are entitled to recover threefold their damages, costs and attorneys' fees from Defendants.

## COUNT VII

### FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
### (On Behalf of Plaintiff and the RICO Class)

229.    Plaintiff hereby repeats the allegations of the complaint and specifically the allegations in Counts V and VI.  Plaintiff asserts this claim on her own behalf and on behalf of the RICO Class members.

230.    From at least January 1, 1998, Defendants conspired with UHG, Ingenix and other Co-Conspirators to conduct, or participate in directly or indirectly, conduct of the affairs of the Defendants-Ingenix Enterprise, described above, through a pattern of racketeering activity as described above in violation of 18 U.S.C. § 1962(d).  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

231.    In furtherance of this conspiracy, Defendants and their Co-Conspirators, including Ingenix and UHG, committed numerous overt acts as alleged in the pattern of racketeering described above, including also submission of data to Ingenix for use in the fraudulent Ingenix Database.

232.    As a direct and proximate result of, and by reason of,  activities of Defendants and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiff and the RICO Class have been injured in their business and property within the meaning of 18 U.S.C. § 1964(c), and are entitled to recover treble damages together with the costs of this lawsuit, expenses and reasonable attorneys' fees.

## VI.    REQUESTED RELIEF

**WHEREFORE**, Plaintiff and the Classes demand judgment in their favor against Defendants as follows:

a.    Certifying the ERISA Class, the RICO Class, and the RICO Section 664 Subclass as set forth in this complaint, and appointing named Plaintiff as Class representative for the Classes;

b.    Declaring that Defendants have breached the terms of their welfare benefit plans, and awarding unpaid benefits to Plaintiff and ERISA Class members, as well as awarding

injunctive and declaratory relief to prevent Defendants' continuing ONET benefit reductions undisclosed and unauthorized by their welfare benefit plan documents;

      c.     Declaring that Defendants have violated their fiduciary duties by failing or causing failure to pay proper out-of-network benefits without justification and by violating their duties of loyalty and care to Plaintiff and the ERISA Class, and awarding appropriate relief, including unpaid benefits, restitution, interest, declaratory and injunctive relief, to Plaintiff and the ERISA Class, and removing Defendants as fiduciaries;

      d.     Enjoining Defendants from violating applicable law and ordering remedial relief for their past violations of applicable law;

      e.     Enjoining Defendants' use of Explanations of Benefits that violate applicable law;

      f.     Declaring that Defendants have failed to provide "full and fair review" to Plaintiff and the ERISA Class members under 29 U.S.C. § 1133, and awarding injunctive, declaratory and other equitable relief to Plaintiff and ERISA Class members to ensure compliance with ERISA;

      g.     Compelling Defendants to allow the provider's billed amount, and to pay additional benefits to Plaintiff and the Classes based on the new allowed amount, in every instance in which Defendants reduced reimbursements due to their usual, customary and reasonable rate determinations that were based on flawed or inadequate data, including through their reliance on the Ingenix Database in violation of contractual terms of FSL's plan, plus interest;

h.      Compelling Defendants to recalculate deductibles and coinsurance charge limits based on the provider's charge (rather than the purported usual, customary and reasonable amount) in every instance in which they improperly reduced benefits;

i.      Declaring that Defendants have violated their disclosure and related obligations under ERISA and federal common law, including under 29 U.S.C. § 1022, for which Plaintiff and the ERISA Class are entitled to injunctive, declaratory and other equitable relief;

j.      Declaring that Defendants have violated Federal claims procedure regulations issued under ERISA, and enjoining any continued violation;

k.      Declaring that Defendants have breached their fiduciary obligations to ERISA Class members under ERISA, including 29 U.S.C., § 1104 and 29 U.S.C. § 1106, 29 U.S.C. § 1022, and 29 U.S.C. § 1024(b)(4), and the federal common law, and awarding declaratory and injunctive relief to remedy same, including but not limited to removal of a fiduciary or appointment of an independent monitor;

l.      Declaring that Defendants and the Defendants-Ingenix Enterprise engaged in a scheme to wrongfully reduce FSL's ONET claims reimbursements to RICO Class members, in violation of 18 U.S.C. § 1962(c);

m.      Declaring that Defendants, through the Defendants-Ingenix Enterprise, made false payments on claims arising under ERISA plans, thereby converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended beneficiary, for Defendants' direct or indirect benefit, in violation of 18 U.S.C. § 664, justifying monetary and injunctive and other relief;

n.      Preliminarily and permanently enjoining Defendants from using the Ingenix Database to determine usual, customary and reasonable rates on ONET claims;

      o.     Preliminarily and permanently enjoining Defendants from making ONET benefit reductions where the individual insurance policy or the group Summary Plan Description does not disclose or authorize them;

      p.     Preliminarily and permanently enjoining Defendants from discouraging provision of ONET health services or placing undisclosed obstacles in the path of FSL Members seeking access to ONET health care;

      q.     Ordering Defendants to recalculate and issue unpaid benefits to Plaintiff and Class members who were underpaid as a result of Defendants' ONET benefit reductions;

      r.     Awarding Plaintiff, RICO Class members and RICO 664 Subclass members compensatory damages, trebled where required by law, and disbursements and expenses of this action, including reasonable counsel fees, costs and reimbursements of expenses, including expert fees, in amounts to be determined by the Court, and other appropriate relief;

      s.     Awarding prejudgment interest; and

      t.     Granting such other and further relief as is just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a jury trial for all claims so triable.

Each attorney set forth below is representing that the allegations with respect to each of his or her clients have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Respectfully Submitted,

s/ David A. Domina
Nebraska State Bar Number: 11043
Attorney for Plaintiff
2425 S. 144th St.
Omaha, Nebraska 68144-3267
Telephone:  402-493-4100
Fax:  402-493-9782
E-mail:  ddomina@dominalaw.com

Michael C. Dodge
Texas State Bar Number: 05937000
Attorney for Plaintiff
GLAST, PHILLIPS & MURRAY, P.C.
2200 One Galleria Tower
13355 Noel Rd., L.B. 48
Dallas, Texas 75240-1518
Telephone:  (972) 419-8300
Fax:  (972) 419-8329
E-mail:  mdodge@gpm-law.com

Andrew S. Friedman
Arizona State Bar Number: 005425
Attorney for Plaintiff
BONNETT, FAIRBOURN,
FRIEDMAN & BALINT, P.C.
2901 North Central Avenue, Suite #1000
Phoenix, Arizona 85012
Telephone:  (602) 274-1100
Fax:  (602) 274-1199
E-mail:  afriedman@BFFB.com

AA8666

Bruce D. Greenberg
Attorney for Plaintiff
LITE, DEPALMA, GREENBERG & RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone:  (973) 623-3000
Fax:  (973) 623-0211
E-mail:  bgreenberg@ldgrlaw.com


Stan P. Baudin
Louisiana State Bar Roll Number: 22937
Attorney for Plaintiff
PENDLEY, BAUDIN & COFFIN, L.L.P.
Post Office Drawer 71
24110 Eden Street
Plaquemine, Louisiana 70765
Telephone:  (225) 687-6396
Fax:  (225) 687-6398
E-mail:  sbaudin@pbclawfirm.com

Scott E. Brady
Louisiana State Bar Number: 24976
Attorney for Plaintiff
BOHRER LAW FIRM, LLC
8712 Jefferson Highway, Suite B
Baton Rouge, Louisiana 70809-2233
Telephone:  (225) 925-5297
Fax:  (225) 231-7000
E-mail:  scott@bohrerlaw.com